```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA                               REPORT AND
                                                       RECOMMENDATION
         - against -
                                                       08 CR 457 (BMC)
TERRANCE C. HOUSTON,

                        Defendant.
------------------------------------------------------X
```

On July 8, 2008, the grand jury returned an indictment charging the defendant, Terrance C. Houston, as a felon in possession of a firearm, having previously been convicted of a crime punishable by a term of imprisonment of more than one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On October 29, 2008, the defendant moved to suppress all post-arrest statements and tangible evidence seized during the course of a police stop on June 9, 2008. The motion was referred to the undersigned to conduct a suppression hearing and issue a Report and Recommendation. For the reasons set forth below, it is respectfully recommended that defendant's motion to suppress be denied.

## FACTUAL BACKGROUND

On February 24, 2009, this Court held an evidentiary hearing to address defendant's motion. At the hearing, the government called two witnesses: Detective Hispolito Sanchez and Officer Fernando Hernandez.[1]

---

[1]The government also offered to produce two additional witnesses, who were not called: Sergeant Mike Cruz and Officer Rahim Morris. (See Transcript of Suppression Hearing, held before this Court on February 24, 2009 (hereinafter "Tr. at ___") at 45-46).

A. Detective Sanchez's Testimony

Detective Sanchez testified that he has been an officer with the New York City Police Department ("NYPD") for fourteen years, currently assigned to the Organized Crime Control Bureau, out of the Information Investigative Support Division. (Tr. at 7-8). Although presently assigned to the Confidential ID section, Detective Sanchez was assigned to the Field Operations Desk at the time of Mr. Houston's arrest. (Id. at 8-9). According to the officer, the Field Operations Desk receives complaints from the public regarding firearms, drugs, and prostitution and functions as the intake unit for the Operation Gun Stop program. (Id. at 9).

According to Detective Sanchez, he was on duty on June 9, 2008 when he received a call on the Operation Gun Stop line at approximately 4:40 a.m. from an anonymous tipster reporting a person with a firearm. (Id. at 9-10; Gvt. Ex.[2] 3500 HS-2). Detective Sanchez explained that when a confidential informant, who is already working with the police, contacts the Operation Gun Stop line, the officer notes the code name and confidential informant number of the caller prior to taking the information. (Tr. at 11). An anonymous tipster can also provide information regarding a firearm through Operation Gun Stop without providing any identifying information. (Id. at 11-12). As part of the program, anonymous tipsters are not required to provide their names (id. at 12, 18), but the tipster is assigned a number for future payment or reward. (Id.)

Detective Sanchez testified that when a call comes in to the Operation Gun Stop line, he fills out an Operation Gun Stop Worksheet, which includes the date and time of the report, his name and shield number, his supervisor's name, information regarding the location of the

---

[2] Citations to "Gvt. Ex." refer to the exhibits introduced by the government during the suppression hearing on February 24, 2009.

weapon and a description of the subject and his actions. (Id. at 12-14; Gvt. Ex. 3500 HS-2). The intake officer also checks address books containing information from previous tips to make certain the address was not previously called in by another tipster, and he performs a "nitro check" to see if any criminal activity had been reported at that address at a different time. (Tr. at 13-14). The form also contains boxes for the intake officer to check to indicate if the information is provided by a confidential informant or an anonymous tipster. (Id. at 14; Gvt. Ex. 3500 HS-2). After the information is recorded and the caller is asked whether he personally saw the weapon, where it was, and how long ago he had seen it, the detective calls 911 and reports a crime in progress. (Tr. at 19). The detective classifies the tip as "qualifying" only if the tipster has seen the firearm sometime within the prior week. (Id. at 15-16).

In this instance, the information reflected on the intake sheet indicated that the subject was in possession of an illegal firearm. (Id. at 14-15; Gvt. Ex. 3500 HS-2). It further indicated that the subject's name was "Junior;" that his nickname was "Walla;" and that he was a black male, approximately 31 years old, 5 feet tall, 180 pounds, wearing a black suit, black baseball cap and black shoes. (Tr. at 14-15; Gvt. Ex. 3500 HS-2). Although the subject's address is listed on the form as "unknown," the caller indicated that the firearm was on the subject's person. (Tr. at 14, 16; Gvt. Ex. 3500 HS-2). The tipster further described the weapon as a chrome colored .38 caliber handgun, make and model unknown. (Tr. at 16; Gvt. Ex. 3500 HS-2).

In this instance, the form indicated that the caller was an anonymous tipster, not a confidential informant,[3] and, according to Detective Sanchez, once the tip was determined to be

---

[3] The government, in a letter supplementing its opposition papers submitted on February 24, 2009 ("Gvt. Ltr. 2/24"), indicated that the tipster had initially made the call to Sgt. Cruz, who has a practice of handing out business cards to individuals he interacts with on the street. (Gvt.

3

qualifying (Tr. at 17, 19; Gvt. Ex. 3500 HS-2), the tipster was asked to hold so that he could be given a tip number and the detective could then report the tip to 911. (Tr. at 17, 19). The tip was assigned the number 4933. (Id. at 17).

B. Officer Fernando Hernandez's Testimony

Fernando Hernandez testified that he is an NYPD officer assigned to the Anti-Crime Unit of the 83rd Precinct. (Id. at 22). On June 9, 2008, he was assigned to patrol the Bushwick section of Brooklyn with his partner, Officer Rahim Morris, and Sgt. Mike Cruz. (Id. at 22-24). During the course of the evening, the officers were driving in an unmarked police car when Sgt. Cruz received a call on his cell phone from an individual who reported that someone with a gun would be in the area where the officers were on patrol, giving "the location of Linden and Bushwick." (Id. at 24-25). According to the description of the call Sgt. Cruz relayed to the other officers, the caller asked about receiving a reward for providing this information, and Sgt. Cruz told him to place a call to the Operation Gun Stop hotline "if and when this other individual showed up." (Id. at 24-25, 43; see also Gvt. Ltr. 2/24 at 2). Sgt. Cruz instructed the tipster to call him back as well "to let us know that that individual was in the area." (Id. at 24-25).

Approximately 10 to 15 minutes prior to the arrest, the caller contacted Sgt. Cruz a second time. (Tr. at 26). The officers were told that a black male, wearing all black, "possibly with firearm," was leaving the location of 36 Linden Street. (Id.) The officers also received a radio call reporting a black male in his mid-20's with a gun at 36 Linden Street. (Id. at 27). No further description of the subject or the subject's clothing was received by the officers over the radio because Sgt. Cruz cut off the transmission to notify the dispatcher that they were already at

---

Ltr. 2/24 at 1 & n.1).

4

the location. (Id. at 27-28). At the location indicated by the tipster, the officers observed the defendant, a black male, walking on Bushwick Avenue, wearing dark clothing, near 36 Linden Street. (Id. at 30-33). The street lights were on at the time and there was no one else in the vicinity. (Tr. at 28-29).

Officer Hernandez exited the police car with his partner Officer Morris and approached the defendant, who was wearing a black suit. (Id. at 33-34). Officer Hernandez identified himself by stating, "Police. Don't move. Hold up." (Id.) He testified that his voice was "loud [but] calm." (Id. at 34). The defendant stopped walking and Officer Hernandez asked him where he was coming from, to which the defendant responded "work." (Id.) Officer Hernandez started walking toward the defendant and asked if he "had anything on his person that was going to injure myself or my partner." (Id. at 34-35). At that point, the defendant "didn't answer. He put his hands straight up in the air." (Id. at 35). At the time, the officer was focused on the defendant's waist, thinking that he was going to search defendant's waist. (Id.) When the defendant put his hands in the air, the officer could "see a bump in his belt line." (Id.)[4] The officer testified that when he saw that, "I went in. I grabbed it. It was hard. I removed it. It was a firearm. And he was placed under arrest." (Id.)

After taking the gun, the officer asked the defendant what he was doing with "something

---

[4] On May 6, 2009, the government submitted a letter ("Gvt. Ltr. 5/6") addressed to defendant's counsel disclosing certain statements by Officer Morris which could be construed as casting doubt on this description of events. Specifically, in interviews with the government, Officer Morris recalled Officer Hernandez "'fanning' the defendant's arms up and away from his waist upon approaching him and re-fanning them away from the defendant's waist as the defendant lowered his hands while talking to Officer Hernandez." (Gvt. Ltr. 5/6 at 1). The parties were again offered the option of taking testimony from Officer Morris, but neither party made such a request. Therefore, in the absence of sworn testimony, the Court will disregard this information.

5

like this," and the defendant responded that "he had a tough job." (Id. at 36). He told the officer that he worked as a security guard at a pool hall. (Id. at 36-37). The officers continued to search the defendant, discovering a handcuff case with a set of handcuffs and two zip-lock bags of marijuana on his person. (Id. at 37).

On cross-examination, the officer conceded that in filling out the report paperwork, he failed to note the phone calls to Sgt. Cruz, and he also failed to mention the calls during his grand jury testimony. (Id. at 39-41).

C. Officer Rahim Morris's Statements

At the hearing, the government offered to call Officer Morris to testify, noting that his description of events would have differed slightly from that of Officer Hernandez. (Tr. at 45-47). Instead, the parties agreed to stipulate that "when interviewed by the government, Morris remembered that Cruz had told him that the defendant was on his way to the tipster's location to buy marijuana and that the tipster . . . believed that the individual was carrying the firearm." (Tr. at 47-48).

DISCUSSION

A. Standards

Defendant moves to suppress all statements and any tangible evidence seized from Mr. Houston, contending that the seizure was unconstitutional in that the officers had no reasonable suspicion to stop him when they did. (Def's. Mot.[5] at 1-2). Defendant contends that he was

---

[5]Citations to "Def's. Mot." refer to the Defendant's Motion to Suppress Statements and Tangible Objects and Memorandum of Law in Support Thereof dated October 29, 2008.

6

simply walking down the street; he was not engaged in any illegal activity, illicit drug use, or "loud or tumultuous conduct." (Houston Decl.[6] ¶ 2). He contends that he was dressed in a professional manner and at no time during his encounter with Officer Hernandez did he "make any furtive movements, attempt to flee or attempt to conceal any contraband." (Id. ¶ 5).

Citing Terry v. Ohio, 392 U.S. 1 (1968), the government contends that "mere police questioning does not constitute a seizure" (Gvt. Mem.[7] at 5), and that there is no Fourth Amendment violation committed simply because an officer approaches an individual on the street and asks if he is willing to answer some questions. (Id. (citing Florida v. Royer, 460 U.S. 491, 498 (1983)). The government further argues that the fact that the officers identify themselves as police officers does not "'convert the encounter into a seizure requiring some level of objective justification.'" (Id. (quoting Florida v. Royer, 460 U.S. at 498)).

It is well established that under Terry v. Ohio, a police officer may briefly detain and question an individual when the officer "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." 392 U.S. at 30; see also United States v. Simmons, 560 F.3d 98, 103 (2d Cir. 2009); United States v. Elmore, 482 F.3d 172, 178 (2d Cir. 2007). In determining whether the officers had "reasonable suspicion" to justify a Terry stop, courts consider whether the officers, under the "'totality of the circumstances,'" had a "'particularized and objective basis'" for suspecting the individual to be engaged in criminal

---

[6] Citations to "Houston Decl." refer to the sworn statement submitted by defendant in support of the motion to suppress which is dated October 29, 2008.

[7] Citations to "Gvt. Mem." refer to the Government's Memorandum of Law of Opposition to Defendant's Motion to Suppress dated November 12, 2008.

wrongdoing. United States v. Simmons, 560 F.3d at 103 (quoting United States v. Arivizu, 534 U.S. 266, 273 (2002)); see United States v. Cortez, 449 U.S. 411, 417-18 (1981); United States v. Salazar, 945 F.2d 47, 49 (2d Cir. 1991); see also United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975) (articulating the test of reasonable suspicion to be when the officers "are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion"). The test is an objective one measured from the perspective of a trained law enforcement officer. United States v. Cortez, 449 U.S. at 418.

When the officers' reasonable suspicion is based on information received from an anonymous tip, the Supreme Court has held that the tip must "bear[] sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Florida v. J.L., 529 U.S. 266, 270 (2000) (quoting Alabama v. White, 496 U.S. 325, 327 (1990)); see also United States v. Elmore, 482 F.3d at 179 (citing Adams v. Williams, 407 U.S. 143, 147 (1972)). In J.L., the officers received an anonymous call that there was a "young black male standing at a particular bus stop and wearing a plaid shirt [who] was carrying a gun." 529 U.S. at 268. In finding that the tip lacked sufficient indicia of reliability, the Court noted that the officers knew nothing about the informant, nor did the informant explain how he knew about the gun or whether there was any basis for believing that he had information about the defendant. Id. at 271. Thus, even though the officers responded to the call, saw three black males at the bus stop, and discovered that the one with the plaid shirt in fact had a gun, the Court held that suppression was required. Id. The Court rejected the argument that a stop and frisk is justified "when (1) an anonymous tip provides a description of a particular person at a particular location illegally carrying a concealed firearm, (2) police promptly verify the pertinent details of the tip except the

existence of the firearm, and (3) there are no factors that cast doubt on the reliability of the tip." Id. The Court explained that although an accurate description of the person's location and appearance help the police identify the right person, it provides no basis for determining whether the tipster has knowledge of criminal activity. See id. at 270-72.

Recently, in United States v. Simmons, the Second Circuit addressed the reliability of an uncorroborated anonymous tip where the caller reports an ongoing emergency. 560 F.3d 98. In Simmons, the police received an anonymous call reporting an assault in progress at a particular location known to have "a gang presence." Id. at 101. The caller indicated that a possible gun was involved and the individual was a male black, wearing a grey hoody and black jacket. Id. When the officers arrived at the location, they did not see any evidence of an assault nor did anyone there report an assault, but they did see the defendant who matched the description provided. Id. When asked to "hold on a second," the defendant continued walking. Id. When asked again to stop, he stopped. Id. He was then told twice to remove his hands from his pockets but refused to comply, prompting the detective to frisk him. Id. During the course of that frisk, the officers recovered two firearms. Id.

In finding that the officers had reasonable suspicion to stop Simmons, the Second Circuit noted that the case was "close," but distinguished the facts from those in J.L. by noting that the officers in Simmons were responding to reports of an assault in progress and that the "corroboration of information identifying the suspect, while insufficient in J.L. . . . is entitled to more weighty consideration in the context of an emergency 911 call." Id. at 107-08. The court explained that it "agree[d] with our sister circuits that an anonymous 911 call reporting an ongoing emergency is entitled to a higher degree of reliability and requires a lesser showing of

corroboration than a tip that alleges general criminality." Id. at 105. The Court further noted that there were other factors providing support for the stop, such as a gathering of people at the location, late at night, in a high-crime area. Id. at 108. Coupled with Simmons' behavior, walking with his hands in his pockets, which "could have suggested to the officers that Simmons was concealing a weapon," the Court found there was sufficient reasonable suspicion to warrant the stop and frisk. Id.

B. At What Point Did the Stop Occur?

The government argues that the facts here are distinguishable from J.L. because when the officers approached the defendant without weapons drawn, identified themselves as officers, and asked if he was armed, defendant raised his hands revealing a bulge under his jacket. The government argues that until this point there was no Terry stop and that it was the defendant's reaction to the question and the presence of the bulge that provided the necessary corroboration to create reasonable suspicion. (Gvt. Mem. at 9).

Based on the testimony of the officers at the hearing, this Court finds otherwise. As the court in Simmons[8] noted, "[a] seizure occurs when (1) a person obeys a police officer's order to stop or (2) a person that does not submit to an officer's show of authority is physically restrained." United States v. Simmons, 560 F.3d at 105 (citing United States v. Swindle, 407 F.3d 562, 572 (2d Cir. 2005)). Just as the Court in Simmons found that the defendant there was seized when he complied with the officer's second order to stop, here Mr. Houston was seized

---

[8]The government did not address the Circuit's recent analysis in Simmons in its initial submissions because the decision was issued after the suppression hearing in this case was held. However, the Court permitted the parties to supplement their papers in light of Simmons, and the government submitted a letter in response on April 27, 2009 ("Gvt. Ltr. 4/27"). Defendant's counsel also submitted a letter, dated April 17, 2009, addressing the decision in Simmons.

when he complied with Officer Hernandez's direction to stop. The officer testified that as he approached Mr. Houston, he stated, "Police. Don't move. Hold up" (Tr. at 34), and thereafter Mr. Houston stopped. No reasonable person in the face of a police directive such as that would have felt "free to leave." See id. at 105-06 (citing United States v. Mendenhall, 446 U.S. 544, 554 (1980)).

As the Circuit has stated, "[t]he grounds for a stop must exist at the time of the seizure." United States v. Simmons, 560 F.3d at 107 (citing United States v. Swindle, 407 F.3d at 567-68, 572); see also California v. Hodari D., 499 U.S. 621, 625-26 (1991). This requirement is based on the rule articulated in Hodari D. that "'reasonable suspicion must arise before a search or seizure is actually effected.'" United States v. Simmons, 560 F.3d at 107 (quoting United States v. Swindle, 407 F.3d at 568). The Supreme Court in Hodari D. held that where a suspect attempts to flee after being ordered to stop, no seizure is effected until the suspect is physically restrained. 499 U.S. at 625-29. However, the Second Circuit made it clear in Simmons that the defendant's refusal to remove his hands from his pockets - - an order that came after he had already stopped and thus been seized - - could not be cited as grounds to justify the reasonableness of the stop. The court noted that "[t]he events that occurred after Simmons complied [with the officer's second order to stop] . . . do not factor into the analysis of reasonable suspicion for the initial stop." United States v. Simmons, 560 F.3d at 107 (citing United States v. Brown, 448 F.3d 239, 245-46 (3d Cir. 2006)). In the instant case, the defendant's actions in raising his arms and revealing the bulge in his jacket occurred after he had been seized and may not be considered in determining whether the officers had reasonable suspicion to justify the initial stop at the time the stop was made.

C. Was There Reasonable Suspicion for the Stop?

Excluding from consideration the defendant's actions and the officers' observations of the bulge after the stop, the indicia of reliability that the government points to in support of finding reasonable suspicion for the stop are the following: (1) the defendant matched the general description provided by the tipster (Gvt. Mem. at 9); (2) he was found "walking alone in a high crime area, at approximately 4:57 a.m." (id.); (3) the tipster predicted that he would arrive at and leave the tipster's location, which was near the location at which the officers found him (Gvt. Ltr. 4/27 at 2); and (4) the tipster reported the information to Operation Gun Stop, seeking a reward. (Gvt. Mem. at 10 n.5). Taken individually, these facts fail to provide adequate corroboration of the tipster's claim of illegal conduct.

There are, however, three additional respects in which this case differs from J.L.: (1) the tipster provided a name and nickname for the defendant; (2) tips to Operation Gun Stop are generally not acted on unless the tipster has seen the firearm within the previous week; and (3) the tipster provided information implicating himself in criminal activity, as well as the defendant. Considering the totality of the factors present, the Court finds that there were sufficient indicia of reliability to support the officers' claim that they had reasonable suspicion to stop the defendant.

Turning first to the four factors cited by the government, as the Court in J.L. explained, the fact that the defendant matched the rough description provided by the tipster does not provide corroboration for the tipster's knowledge of illegal activity. Florida v. J.L., 529 U.S. at 272. The fact that the defendant was alone also provides no support whatsoever for the officers' suspicions. Cf. United States v. Simmons, 560 F.3d at 108 (noting that the fact that defendant was found "along with a gathering of people" could provide support for officers' suspicions).

12

Although the Simmons court considered the late hour and "high-crime" location to be "relevant consideration[s]," it also noted that they were "by no means dispositive." Id. In general, courts should not rest a finding of reasonable suspicion on these factors alone. See Maryland v. Buie, 494 U.S. 325, 334 n.2 (1990) (noting that "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted"); see also United States v. Person, 134 F. Supp. 2d 517, 526 n.7 (E.D.N.Y. 2001); United States v. Floyd, No. 99 CR 234, 1999 WL 673050, at *8 (S.D.N.Y. Aug. 30, 1999). The fact that defendant was walking down the street late at night in a high crime area is therefore insufficient corroboration of the anonymous tip to distinguish this case from J.L.

Corroboration of predictive information provided by a tipster may be used to demonstrate the tipster's reliability. See Florida v. J.L., 529 U.S. at 270-71. Here, the tipster not only provided the current location of the defendant, but also predicted that the defendant would arrive at and leave a particular address at a particular time. This information approaches the type of predictive information that distinguished Alabama v. White from J.L. In White, the tipster told the police that the defendant was carrying cocaine and "would leave an apartment building at a specified time, get into a car matching a particular description, and drive to a named motel." Florida v. J.L., 529 U.S. at 270 (citing Alabama v. White, 496 U.S. at 327). The police then observed the defendant leave the apartment building, get into a car matching the tipster's description, and drive in the direction of the specified motel, at which point they pulled her over. Alabama v. White, 496 U.S. at 327. The Court held that these observations provided sufficient corroboration of the tip to provide reasonable suspicion that the defendant was engaged in

13

criminal activity. Id. at 331. Here, although the tipster did not provide as much detail as was given in White, the predictive information given is nevertheless significant, and provides an indication of reliability that the officers in J.L. did not have. This is especially so when viewed in light of the tipster's compliance with Sgt. Cruz's instructions to call the hotline and call him back when the defendant arrived at the tipster's location.

The government also argues that the fact that the caller reported the information to Operation Gun Stop, seeking a reward which he would not receive if the tip proved to be unfounded, demonstrates the tip's reliability and distinguishes this case from J.L. (Gvt. Mem. at 10 n.5). However, the Court finds that while the reward may provide an added incentive to a tipster to give accurate information to the police, it is not sufficient to demonstrate the reliability of the tip. As the Court explained in J.L., information from an anonymous tipster is less reliable than that from a known informant because unlike a known informant, an anonymous tipster has no reputation that can be assessed and the tipster cannot be held responsible if the information provided turns out to be fabricated. Florida v. J.L., 529 U.S. at 270. Operation Gun Stop does not provide any disincentive to an individual providing fabricated information, and tips provided through the hotline hold the same potential for abuse as tips provided through an ordinary call to the police. Moreover, there is nothing in the record to establish that the tipster knew how Operation Gun Stop worked at the time he made the tip[9] — he might well have believed that a reward would be provided for any information, not just information leading to an arrest, in which case the offered reward could actually have provided for a greater potential for abuse and less

---

[9]Asked if there was "any discussion of how the Gun Stop program worked" during the first phone call to Sgt. Cruz, Officer Hernandez responded that he did not remember. (Tr. at 25).

14

reliable information.

Turning to the three additional factors, the fact that the tipster was able to provide a name and nickname[10] for the defendant makes this case slightly different from J.L., but this difference is not significant enough to provide corroboration of the tip. See United States v. Davis, No. 3:00 CR 94, 2000 WL 1873966, at *4 (D. Conn. Nov. 30, 2000) (noting that "anonymous caller's knowledge of the defendant's name, and [the police officer's] confirmation of that information, did not constitute sufficient corroboration of the anonymous tip to make it reliable"). Indeed, there is no evidence before this Court to suggest that the officers at the location were aware of the name or nickname or that any attempt was made to verify that Mr. Houston was known by these names.[11]

Detective Sanchez pointed out in his testimony that it is a requirement of Operation Gun Stop that the tipster must have seen the firearm within the last week for the tip to be processed and followed up. (Tr. at 15-17). Thus, unlike in J.L., where the officers had no information about how the tipster knew the defendant was carrying a gun, Florida v. J.L., 529 U.S. at 271, here Detective Sanchez verified the fact that the tipster had seen the firearm himself within the

---

[10]According to Detective Sanchez, the tipster reported the subject's name as "Junior" and nickname as "Walla." (Tr. at 14-15; Gvt. Ex. 3500 HS-2). However, defendant's real name is not "Junior," and it is unclear from the record whether he is in fact known as "Junior" or "Walla."

[11]This information along with other details provided to Detective Sanchez, including the description of the gun, were not passed along to the arresting officers until after the gun was recovered because when the Operation Gun Stop report came over the radio, Sgt. Cruz cut off the transmission by getting on the radio and stating that the officers were already on the scene. (Tr. at 27-28). However, even if such details may be imputed to the arresting officers under the collective knowledge doctrine, see United States v. Colon, 250 F.3d 130 (2d Cir. 2001), they still provide insufficient corroboration of the tip.

last week. While this alone may not justify the stop, see United States v. Person, 134 F. Supp. 2d at 519 (holding that anonymous tip specifying that tipster saw subject's gun on his person did not create reasonable suspicion), here there was the additional factor as recalled by Officer Morris that "the defendant was on his way to the tipster's location to buy marijuana." (Tr. at 47). Although a tip containing only a bare claim that the defendant is carrying a firearm with no basis for the information provided would not demonstrate sufficient reliability to justify a stop, here the tipster's own inculpatory statement, demonstrating direct personal knowledge of criminal activity and providing the address at which the activity was to take place, when coupled with all of the other factors present in this case, provides an added element of reliability. Courts generally consider a statement made against penal interest to carry additional reliability. See, e.g., United States v. Rowell, 903 F.2d 899, 903 (2d Cir. 1990) (holding "the reliability of one of the informants is indicated by his statement, made against his penal interest, that he had personally purchased cocaine from Rowell"); United States v. Napolitano, 761 F.2d 135, 139 (2d Cir.) (noting that "[t]he evidence came from sources who supplied evidence against their own penal interest, establishing reliability"), cert. denied, 474 U.S. 842 (1985); see also United States v. Harris, 403 U.S. 573, 583-84 (1971) (plurality opinion) (commenting that "[c]ommon sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility — sufficient at least to support a finding of probable cause to search"); United States v. Tyler, 238 F.3d 1036, 1039 (8th Cir. 2001) (holding that "[w]e also believe that [the informant's] disclosures were presumptively

credible because they were made against his penal interest" and that "[s]tatements against the penal interest of an informant typically 'carry considerable weight'") (quoting United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996)).

In Illinois v. Gates, 462 U.S. 213, 237-38 (1983), the Supreme Court considered the concerns raised by anonymous tipsters and noted that "[o]rdinary citizens, like ordinary witnesses . . . generally do not provide extensive recitations of the basis of their everyday observations. . . . [T]he veracity of persons supplying anonymous tips is by hypothesis largely unknown, and unknowable. . . . Yet, such tips, particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise 'perfect crimes.'" In that case, the Court found that "even if we entertain some doubt as to an informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." Id. at 234.

Although the circumstances leading to the stop and seizure of Mr. Houston may be "borderline," Florida v. J.L., 529 U.S. at 271, this Court respectfully recommends that the motion to suppress be denied. The combination of circumstances, including the tipster's prediction of the defendant's movements, the defendant's presence in a high crime area in the early hours of the morning, the calls first to Officer Cruz and then to Operation Gun Stop, with its requirements for verifying tipster information, and most importantly, the tipster's inculpatory statements providing a basis for his knowledge of the illegal activity, provide the requisite "reasonable suspicion" to justify the officers' stop of the defendant.

D. Was There Reasonable Suspicion for the Frisk?

Defendant raises a second claim – that the officers' actions in conducting the frisk of the defendant once he raised his hands and the bulge was seen were not justified. Given all the information available to the officers at the time, this Court finds that the officers acted reasonably in conducting the frisk and therefore suppression on these grounds should not be required. See United States v. Muhammad, 463 F.3d 115 (2d Cir. 2006).

## CONCLUSION

Accordingly, given the totality of the circumstances and the holdings in Simmons and J.L., the Court respectfully recommends that Mr. Houston's motion to suppress be denied on the grounds that the officers possessed reasonable suspicion to justify the Terry stop and frisk.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
June 5, 2009

Cheryl L. Pollak
United States Magistrate Judge